UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:19-cr-122-MPS |
| | : | |
| v. | : | |
| | : | |
| DAVID BOURNE | : | April 3, 2020 |

Defendant's Memorandum In Aid of Sentencing

This memorandum is respectfully submitted on behalf of the defendant, David Bourne, to assist the Court in determining an appropriate sentence.

The defendant, David Bourne, pleaded guilty to one count of possession of an unregistered firearm, specifically an explosive device, in violation of Title 26, United States Code§§ 5841, 5861(d) and 5871.

Mr. Bourne has acknowledged that he threw an explosive device into the bed of a pickup truck on January 2, 2019.  The device, a PVC tube stuffed with black powder, caused a loud explosion, but caused little damage to the pickup truck — it scattered garbage that was in a bag in the truck bed and appears to have loosened a rear light on the truck.  The incident that Mr. Bourne says triggered his action on January 2nd is described in the PSR at Paragraph 20.  Mr. Bourne has also acknowledged that on an earlier date, he and a friend made and setoff explosives, and that video of these explosions was posted on YouTube.  Mr. Bourne realizes that his actions were wrong and that his behavior was what one might expect from a maladjusted juvenile, not an adult in his late 30s.

The History and Characteristics of the Defendant

Mr. Bourne's parents were divorced when he was three. His mother, Christine Zeisser, remarried two years later. She reports that during her courtship with Mr. Zeisser, he acted affectionately towards David. But once married, she saw a different side of her new husband. He seemed to resent David's very existence and showed David "zero affection." [1]

When David was seven, a relative told Mrs. Zeisser that she had witnessed Mr. Zeisser slam David face-first to the ground. She confronted Mr. Zeisser about the incident, threatening to leave him and report him to the police.

Graeme Roderick, a childhood friend of David's, remembers an incident when he and David were ten. The two were playing video games at the Zeisser home. Mr. Zeisser became annoyed at the two for being too loud and slapped David so hard that David got a bloody nose.[2]

Mr. Bourne reports another incident when he was about nine. David was helping unload the car and Mr. Zeisser, who apparently felt David wasn't moving fast enough, hit David in the back of the head knocking him to the ground.

David also reports that, when he was in second grade, the school nurse noticed bruises on his body and called his home questioning how David had gotten them. They had been inflicted by Mr. Zeisser, but the nurse was given another explanation, and the matter was not pursued with child protection authorities.

---

[1] Mrs. Zeisser was interviewed by counsel on April 1, 2020.

[2] Mr. Roderick was interviewed by counsel on April 1, 2020.

In January 1998, when he was midway through his junior year of high school, David and his stepfather got into an altercation. His sister Katherine remembers seeing her father pinning David to the floor and punching him. The police were called, and both David and Mr. Zeisser were arrested. [3]

David was required to take an anger management course, and his stepfather was required to complete a domestic violence program. David moved out of the family home into an apartment of his own. PSR at Paragraph 58. David dropped out of high school and supported himself. A number of tumultuous years followed where David was arrested, served time on misdemeanor charges, and drank heavily.

The Defendant's Work Ethic

Since his teenage years, Mr. Bourne has always worked. His former employers describe him as one of their hardest working and most conscientious employees. For instance, Jeff Palazzo, who ran a family painting business that his grandfather started in the1930s, remembers hiring David when David was 18. Palazzo reports that, unlike most of the young workers he hired, David never required supervision. He added:

> David was respectful; he would do what you asked and do it properly. You don't see kids in their teenage years act as responsibly as David. Of all my employees, David was my favorite.[4]

Peter Rothman, who owns a landscaping and snow removal business, said he first hired David about twelve years ago. Mr. Rothman described David as a "hard worker, always looking to stay busy" He added "David had a strong work ethic."[5]

---

[3] Mrs. Kelly was interviewed by counsel on April 2, 2020.

[4] Mr. Palazzo was interviewed by counsel on April 1, 2020.

[5] Mr. Rothman was interviewed by counsel on April 1, 2020.

Matt Brown, the owner an MMB, LLC., a landscaping and irrigation company, worked with Mr. Bourne for many years. He described Mr. Bourne as "a great worker. I left David alone on jobs. He always got the job done. I could let he keep his own hours because I knew he was honest. I trusted him with the keys to my in-laws home — something I wouldn't have done with any other workers."[6]

Mr. Bourne presently works for his brother-in-law Matthew Kelly who started a landscaping and solar power business after a career in the Army. Mr. Kelly described Mr. Bourne as a "great worker." He added, "David is the first to get dirty. He's a huge help." [7]

Fatherhood and Marriage

Mr. Bourne was in jail on a parole violation in July 2002 and missed the birth of his daughter, Caitlynne Marie Bourne. Caitlynne's mother had a serious drug problem, and Mrs. Zeisser was appointed guardian of her granddaughter.

In November of 2003, Mr. Bourne completed his sentence. Upon his release from jail, David took custody of Caitlynne, although Mrs. Zeisser remained her granddaughter's legal guardian.

Over the next fourteen years, Mr. Bourne worked in landscaping and irrigation jobs, got married to his wife Elizabeth, and bought a house in West Hartland, Connecticut. In January of 2006, Elizabeth gave birth to David Roland Bourne. Mr. and Mrs. Bourne lived a typical middle class family life with Caitlynne, David Roland, and Mr. Bourne's stepdaughter, Dililah Martin. In 2008, Mr. Bourne was awarded full custody of Caitlynne and her absent mother's parental rights were terminated.

---

[6] Mr. Brown was interviewed by counsel on April 1 and reinterviewed on April 2, 2020

[7] Mr. Kelly was interviewed by counsel on April 2, 2020.

4

From the accounts of Mr. Bourne's friends, employers, mother, and brother-in-law, Mr. Bourne was and is a devoted and good parent. Caitlynne, David Roland, and Mr. Bourne's stepdaughter, Dililah, meant the world to Mr. Bourne.

Both Mrs. Bourne and Mr. Bourne were heavy drinkers, according to Mr. Bourne. However, on October 8, 2013, Mr. Bourne checked himself into the Rushford Medical Center for a five-day alcohol detox program. Mr. Bourne has not had a drop of alcohol since that date. But rather than improving their marriage, Mr. Bourne's sobriety worsened it. Drinking was a big part of the couple's social life. Having sworn off alcohol, Mr. Bourne had no desire to socialize at parties where everyone drank.

<u>Separation and Divorce</u>

In November 2016, the Bournes separated. The separation marked the beginning of a contentious custody battle over the couple's son and the denial of Mr. Bourne having any involvement in his stepdaughters life. Mrs. Bourne obtained a civil restraining order claiming Mr. Bourne was "verbally abusive." She later made a number of complaints claiming Mr. Bourne had violated the order.

One of the complaints involved an incident where Mr. Bourne rushed to the house when their son called him, saying he was on the roof and wanted to kill himself. Another complaint occurred when Mr. Bourne learned that his son was snowboarding at Ski Sundown one week after suffering a concussion and having been instructed by his pediatrician not to snowboard for three weeks. Mrs. Bourne worked at Ski Sundown. Mrs. Bourne's complaints resulted in Mr. Bourne being arrested a half-dozen times only to have the charges dropped.

Matt Brown, who employed Mr. Bourne during some of this period, said Mr. Bourne seemed "emotionally destroyed" by the separation and contentious custody battle.

In February 2017, during a snowstorm that closed schools, Mr. Bourne called and texted his wife repeatedly to arrange to drop off his daughter, Caitlynne, and collect his snow pants and rubber boots before going to work snowplowing. In frustration after arriving at the house, Mr. Bourne tossed one of his rubber boots, which hit Mrs. Bourne, causing a bloody nose. Mr. Bourne claimed he didn't mean to hit his wife but ultimately pleaded *nolo contendere* to assault third and received a suspended sentence of one year and 18 months probation. This incident resulted in a protective order being issued against Mr. Bourne.

After this incident, Mr. Bourne went into an emotional tailspin. On September 1, 2017, Mr. Bourne sent his wife a series of offensive text messages and was subsequently arrested for criminal violation of the protective order, a class D felony. He pleaded guilty to that charge on November 6, 2018, and was sentenced on February 1, 2019.

In April of 2018, Mrs. Bourne filed for divorce. Mrs. Bourne sought alimony, full custody of the couple's son, and child support. Ultimately, based on the recommendations of Family Relations, the couple agreed to joint custody of their son, child support, but no alimony.[8] Mr. Bourne quitclaimed his interest in the family home to Mrs. Bourne. A final judgment of dissolution was entered on December 12, 2018.

---

[8] Family Relations found that Mrs. Bourne had made misrepresentations on her financial affidavit.

The Guidelines Calculation

In the plea agreement, the government and the defense calculated the offense level as 19. The PSR at Paragraph 38 arrived at the same offense level. The plea agreement listed the defendant's criminal history category as Category III. However, it came up with a sentencing range of 33 to 41 months, which is the sentencing range for criminal history Category II.

The reason for this discrepancy is that the government initially believed the defendant was on probation for violation of a protective order on January 2, 2019, when he committed the instant offense, which would add 2 points to the defendant's criminal history score for a total of 5 points. After some discussion with defense counsel, the government agreed that the defendant was not on probation at the timer of the instant offense. Inadvertently, while the sentencing range was adjusted to reflect criminal history Category II, the language from the initial draft of the plea agreement about criminal history Category III made its way into the final draft. Defense counsel should have spotted this mistake but focussed his attention on the sentencing range.

The PSR at Paragraph 48 concludes that the defendant was on probation at the time of the offense. Admittedly, the record is confusing because, in most cases, when a defendant receives a suspended sentence, that sentence is imposed on the date of the guilty plea. However, that was not the case here. The Connecticut Judicial Branch "Criminal/Motor Vehicle Conviction Case Detail" shows that in Case No. L18W-CR17-0153649-S, the defendant pleaded guilty to violation of a protective order on November 6, 2018, but was not sentenced for that crime until February 1, 2019, when he received a suspended five-year sentence and probation.

While Mr. Bourne was not on probation for the violation of a protective order, counsel has learned from Olga Sabota, the defendant's state probation officer, that he was under a form of pretrial supervision relating to the violation of probation for his 2017 assault third case. Thus, technically while assigned for the wrong case, the two points added to his criminal history score may apply.  However, counsel believes that the defendant should receive the benefit of the sentencing range in the plea agreement.

The Defendant's Post Arrest Conduct

Since his arrest in the instant case, Mr. Bourne has made an extraordinary effort to put his life on a different path.  Ms. Sabota first supervised Mr. Bourne in June 2017, when he was on probation for assault third.  Her supervision of Mr. Bourne continued during the pretrial period.  Ms. Sabota currently is his probation officer for his violation of a protective order.  Ms. Sabota told counsel, "I feel that he has learned his lesson and has absolutely turned his life around. I see a changed person in him."[9]

Ms.  Sabota noted that Mr. Bourne completed the 26 week Explorer Program at the Wheeler Clinic, which was a condition of his state probation, but also completed other programs that were not required by state probation or federal pretrial services such as one-on-one counseling with a therapist.

Other programs Mr. Bourne completed are the Wheeler Clinics Men's Empowerment Program, the twelve-week Relapse Prevention Program at the Connecticut Renewal Team (CRT) as well as individual counseling at CRT.

Since his release on home incarceration and then home confinement, Mr. Bourne has been in full compliance with every condition of release without a single violation. He has also kept steady employment.  When it was suggested he apply for Support

---

[9] Officer Sabota spoke to counsel on April 2, 2020.

Court, Mr. Bourne attended the requisite sessions and applied to the program, although he was not accepted because he had been sober since 2013.[10]

The Court is instructed by 18 U.S.C. § 3553 to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The Court is to impose a sentence that is sufficient but not greater than necessary to achieve these goals.

A defendant's post offense conduct may be considered by the Court in fashioning an appropriate sentence. Pepper v. United States, 562 U.S. 476, 491–93 (2011). A court is to sentence the defendant as he stands before the court on the day of sentencing. Such conduct is particularly relevant to whether a defendant is likely to offend again. By doing so much more than was required to meet the conditions of his release, the defendant in a sense rehabilitated himself. Gall v. United States, 552 U.S. 38 (2007).

COVID-19 and Mr. Bourne's Role in Caring for His Daughter and Son

Mr. Bourne's daughter Caitlynne (17) is in her senior year of high school. She struggles to keep up with her studies. Caitlynne has always had difficulty in school. Mr. Bourne's son David (13) now spends over half his time with his father. He is an exception snowboarder, a young man whose coaches think has Olympic potential. David is in eighth grade and a good student who gets As and Bs. Both of these children depend heavily on their father. Their schools are closed. Although teachers are

---

[10] Mr. Bourne had used marijuana on a daily basis before his arrest, which counsel believed made him an appropriate candidate. It should be noted that Mr. Bourne has abstained from marijuana use since his release and passed every drug test.

9

providing some computer-based instruction, it is doubtful that Caitlynne will be able to graduate from high school this year.

Mrs. Zeisser is 62. She has smoked since she was a teenager. She has a history of asthma and other bronchial issues. Due to these factors, Mrs. Zeisser faces a high risk of critical illness or death if she contracts COVID-19.

If Mr. Bourne is incarcerated for a prolonged period, and Mrs. Zeisser becomes ill, Caitlynne will have no one to supervise her and help her with school work. Normally, such factors as these do not play a significant role in federal sentencing, but we are not in normal times. Courts have seldom considered the impact of incarceration of a parent on children and families.[11]  One exception was United States v. Johnson, 964 F.2d 124 (2d Cir. 1992),  where the Second Circuit upheld Judge Patterson's downward departure of ten levels based upon the defendant's "extraordinary" family responsibilities.

---

[11] Medical research has shown that parental incarceration not only affects the mental health of children but also their  physical health.  See, for example, The Impact of Parental Incarceration on the Physical and Mental Health of Young Adults, Pediatrics. 2013 Apr; 131(4): e1188–e1195. In times such as these, when children justifiably fearful loved ones may die, the impact of parental incarceration is probably far greater.

Conclusion

For the reasons stated above, the defense believes that a sentence significantly below the Sentencing Guidelines range is appropriate in this case.

        Respectfully submitted,
        The Defendant, David Bourne

        By: /S/ Miles Gerety
            Miles Gerety
            His Attorney
            Federal Bar No. ct 29380
            P.O. Box 38
            Redding Ridge, CT 06876
            (203) 241-8984

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on April 3, 2020, a copy of the foregoing memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

        /S/ Miles Gerety
        Miles Gerety